IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| DAVID EMMANUEL LUCAS, | CV 15-00076-H-DLC-JTJ |
| Plaintiff, | |
| vs. | FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |
| SAM JOVANOVICH, TAYLOR CUNNINGHAM, KEN ARNOLD, SGT. WOHLMAN, LEROY KIRKEGARD, and DAN HUNTER, | |
| Defendants. | |

Plaintiff David Lucas, a state prisoner proceeding without counsel, brought this lawsuit under 42 U.S.C. § 1983 alleging Defendants were deliberately indifferent to his safety and as a result he fell down a hole injuring himself. (Doc. 2.)

Defendants filed a motion for summary judgment arguing that they were not deliberately indifferent and that the risk to Mr. Lucas was not substantial enough to give rise to a constitutional violation. The Court agrees with Defendants and recommends that the motion for summary judgment be granted.

1

## I.      MOTION FOR SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).

Summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  "Where the non-moving party bears the burden of proof at trial, the moving party need only

2

prove that there is an absence of evidence to support the non-moving party's case."
*Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R.
Civ. P. 56(c)(1)(B).

If the moving party meets its initial responsibility, the burden then shifts to
the opposing party to establish that a genuine issue as to any material fact actually
does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,
586-87 (1986). In attempting to establish the existence of this factual dispute, the
opposing party may not rely upon the allegations or denials of its pleadings but is
required to tender evidence of specific facts in the form of affidavits, and/or
admissible discovery material, in support of its contention that the dispute exists.
*See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. The opposing party
must demonstrate that the fact in contention is material, i.e., a fact "that might
affect the outcome of the suit under the governing law," *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec.
Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is
genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for
the nonmoving party." *Anderson*, 447 U.S. at 248. To demonstrate a genuine
issue, the opposing party "must do more than simply show that there is some
metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations

omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). Yet, it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987).

By notice provided January 27, 2017 (Doc. 51), Mr. Lucas was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

## II. FACTS

Plaintiff David Lucas was an inmate at Montana State Prison (MSP) housed High Side Unit-1 (HSU1) from January 2013 to October 2016. (Statement of Undisputed Facts, Doc. 49 ("SUF") at ¶ 1.) He was employed as a unit laundry worker from May 4, 2015 to June 30, 2015. (SUF at ¶ 24.)

On May 13, 2015, Mr. Lucas fell down a hatch in the Y-Room, a storage room located to the left of the entrance door of HSU1. The Y-room is accessible only from the exterior of the building and it requires a key to enter. (SUF at ¶ 11.)

4

The Y-Room was used to store Unit supplies and other items such as folders, boxes, and desk drawers.  (SUF at ¶ 16.)  On a weekly, and sometimes twice weekly basis, supplies delivered to the Unit would fill up the Y-Room since the room is also used to store items received at the Unit but which have not yet been processed and distributed within the Unit.  (SUF at ¶ 17.)

The access point for the basement of HSU1 is located in the floor of the Y-Room.  This access point is a horizontal opening about 4' by 4' and which is secured by a metal plate, also called a hatch, which is bolted to the floor with hinges on one side so that it can be opened.  On the floor around the metal plate is a stripe of orange safety paint.  (SUF at ¶ 17.)  Mr. Lucas contends the orange outline paint was well-worn and barely visible on May 13, 2015.  (MSJ Response, Doc. 54 at 3.)

Dan Hunter was a Maintenance Worker at MSP from May 2008 to September of 2016.  (SUF at ¶ 7.)  He went into the Y-Room on the afternoon of May 13, 2015, to work on the air handling system in HSU1.  He closed the door behind him while he was there.  The room was crowded with boxes around the hatch which he had to move to reach and open the hatch.  Both the ceiling light and the basement light were operational in the Y-room on May 13, 2015 (SUF at ¶ 15) and Mr. Hunter used both to perform his work.  (SUF at ¶ 32.)

5

As Mr. Hunter was coming up the ladder from the basement, Officer Brian Cunningham opened the Y-Room door.  Officer Cunningham has been a Correctional Officer at MSP for approximately two years.  He was on duty in HSU1 during second shift on May 13, 2015.  (SUF at ¶ 8.)  As of May 13, 2015, Officer Cunningham had worked a total of approximately five days in HSU1. (SUF at ¶ 9.)

When Officer Cunningham opened the Y-room door, he was accompanied by two inmates.  (SUF at ¶ 34.)  Because the Y-Room is a secured access area, as Mr. Hunter was leaving he asked Officer Cunningham whether he would stay nearby or if Mr. Hunter should lock the door.  Officer Cunningham responded that he would stay there.  Mr. Hunter went to the lawn area with the inmate yard workers to knock out the filters.  (SUF at ¶ 35.)[1]

Shortly after the two inmates walked with Mr. Hunter out into the grass area, Mr. Lucas entered the Y-Room.  (SUF at ¶ 36.)  Mr. Lucas indicates that he asked Officer Cunningham for permission to enter the Y-room to check inventory and Officer Cunningham granted him permission.  (MSJ Response, Doc. 54 at 5.)  He contends the lights were not on in Y-room or in the basement.  (Doc. 54 at 2.).

---

[1]Mr. Lucas suggests that this conversation did not take place because it was not mentioned in Defendants' incident reports.  This is not a sufficient basis to dispute Mr. Hunter's affidavit.

Mr. Lucas described the incident on May 13, 2015 in his May 22, 2015 grievance as follows:

> On 5-13-15 I was working in HSU1 as the unit laundry worker. I had entered the HSU1 wire room (Y-room) to check inventory of clothing/supplies. I had entered the room coming from a light sunny day and my eyes weren't fully adjusted. I started moving boxes and the supervising officer at the time, (I believe it was Officer Taylor) had told me to watch my step. I turned to see what he was talking about when I fell down a concrete basement sub level 10' to 12' deep.

(May 22, 2015 Grievance, Doc. 54-6.) In his deposition, Mr. Lucas stated he was moving items around in the Y-Room for one to two minutes prior to his fall. (SUF at ¶ 39.) Approximately a minute after Mr. Lucas entered the Y-Room, Officer Cunningham saw Mr. Lucas looking at boxes in the Y-Room but Mr. Lucas did not seem to notice the floor hatch was open. Officer Cunningham said to Mr. Lucas, "Watch out!" (SUF at ¶ 40; MSJ Response, Doc. 54 at 6.)

Mr. Lucas stepped backwards and fell through the open hatch to the basement of HSU1. (SUF at ¶ 41.) Officer Cunningham immediately entered the Y-Room and began descending the stationary ladder above the hatch; he called out to the other unit floor officer to get the Sergeant. (SUF at ¶ 42.) Multiple staff members, including medical staff, responded to the Y-Room and worked to secure Mr. Lucas to a backboard and then into an extraction basket. (SUF at ¶ 43.)

After being extracted from the basement, Mr. Lucas was transported to the

MSP Infirmary and then to the Deer Lodge Medical Center where he was evaluated

by Dr. Jason McIsaac.  Mr. Lucas suffered multiple sprains and bruises and a left

elbow sprain but was assessed as having no fractures, dislocations or evidence of a

head injury.  (SUF at ¶ 44.)  Mr. Lucas was returned to MSP and HSU1 later in the

evening on May 13, 2015.  (SUF at ¶ 45.)

## III.  ALLEGATIONS

Mr. Lucas alleges Defendants violated his rights under the Eighth

Amendment by being deliberately indifferent to his health, safety and welfare by

ignoring safety hazards that caused his injuries when he fell down in the basement

shaft on May 13, 2015.  (Complaint, Doc. 2 at 6.)

## IV.  ANALYSIS

"Persons involuntarily confined by the state have a constitutional right to

safe conditions of confinement."  *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th

Cir. 1985).  "This is required because inmates, by reason of their confinement,

cannot provide for their own safety."  *Id.*  To prevail on an Eighth Amendment

"prison conditions" claim based on failure to prevent harm, the inmate must show

that he is incarcerated under conditions posing a substantial risk of serious harm.

*Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  When a prison official is

deliberately indifferent to a substantial risk of serious harm, his conduct violates

8

the Eighth Amendment.  *Id.* at 828.  Deliberate indifference exists when an official

is "aware of facts from which the inference could be drawn that a substantial risk

of harm exists," and actually draws such an inference.  *Id.* at 838.

Mr. Lucas alleges Defendants acted with deliberate indifference to his safety

because they knew of the hazard presented by the open hatch and failed to take

precautions to make it safe.  Defendants argue that the open hatch was not an

objectively excessive risk and no defendant had a subjective sufficiently culpable

state of mind.  Even if there was evidence of deliberate indifference, Defendants

argue they are entitled to summary judgment.  (Doc. 50.)

For reasons more fully explained below, the Court finds there is no genuine

issue of material fact upon which a reasonable jury could conclude Defendants

were was deliberately indifferent to Mr. Lucas's safety.

The Court likens this case to prison slip and fall cases.  Generally there is no

constitutional liability arising from a prison slip and fall.  *Jackson v. State of Ariz.*,

885 F.2d 639, 641 (9th Cir. 1989), *superseded by statute on other grounds as*

*stated in Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (internal citation

omitted).  Yet, in *Frost v. Agnos*, 152 F.3d 1124, 1129 (9th Cir. 1998), the Ninth

Circuit acknowledged that such a claim may be established where there is

sufficiently special or unique circumstances that require the Court to depart from

9

the general rule barring Eighth Amendment liability in prison slip and fall cases.

In *Frost*, the Ninth Circuit reversed summary judgment for a prisoner who asserted

an Eighth Amendment claim where prison officials were aware that a pretrial

detainee on crutches had previously fallen and injured himself several times in the

shower.  *Id.* at 1129.  Specifically, the prisoner put the officials on notice by filing

several grievance forms alerting the officials the showers posed a significant risk to

him.  *Id.*

Similarly, the Ninth Circuit in *Townsend v. Sisto*, 457 F.App'x 653 (9th Cir.

2011), concluded the district court's dismissal of a prisoner's Eighth Amendment

claim was improper where the prisoner "alleged prisoner officials were aware that

the poorly maintained shower floors posed a risk to inmate safety yet failed to take

reasonable measures to avoid that threat."  *Id.* at 654.  Specifically, the prisoner in

*Townsend* alleged defendants:

> [K]new or should have known that the showers at California State
> Prison required routine maintenance and repair; that they did not
> follow their own operation plan; that the shower floors were uneven,
> had missing tiles, were slippery, were not equipped with mats, safety
> strips or handicap bars; that inmates had complained about the
> conditions of the showers; and that, as a result, plaintiff fell and his
> shoulder came out of its socket.

*Townsend v. Sisto*, 2010 WL 2628975, at *1 (E.D. Cal. June 25, 2010) rev'd and

remanded, 457 F.App'x 653 (9th Cir. 2011).

10

Mr. Lucas argues Defendants were on notice that the open hatch presented a danger to inmates which needed to be addressed.  In support of this argument, he claims that Lucas, Inmate Ball, and Inmate Rodarte all state that there had been notifications about the lights, the hatch being left open, the safety chain not being used, and the lack of supervision.  (MSJ Response, Doc. 54 at 7.)  In addition, Inmate Ball, who has been at MSP for 25 or more years, testified that he heard of someone getting injured in the Y-Room "maybe one incident, and I haven't heard of anything more. … [W]e're talking maybe 1980."  (SUF at ¶ 51.)

Therefore, unlike the *Frost* and *Townsend* cases, the only possible prior incident in which someone was injured as a result of the basement hatch occurred at least 35 years ago.  In addition, the Defendants presented undisputed testimony that they were unaware of safety problems with the hatch in the Y-room.  Between March 1, 2015, and May 15, 2013, none of the Defendants has any recollection of being alerted by inmates or staff, or receiving a written report of an issue concerning the HSU1 Y-Room, including the basement, the lighting, the floor hatch or the safety chain in the Y-Room, or an alleged lack of supervision.  (SUF at ¶ 48.)

Warden Kirkegard, who has been at MSP for 5 years, has not heard of anyone besides Mr. Lucas ever being injured by a floor hatch such as the one in the

11

Y-Room of HSU1 or falling through a floor hatch, as Mr. Lucas has alleged.  (SUF at ¶ 52.)

Mr. Hunter, who worked at MSP for 8 years, has not heard of anyone besides Mr. Lucas ever being injured by a floor hatch such as the one in the Y-Room of HSU1 or falling through a floor hatch, as Mr. Lucas has alleged.  (SUF at ¶ 53.)  UM Jovanovich, who has been at MSP for 13 and a half years, has not heard of anyone besides Mr. Lucas ever being injured by a floor hatch such as the one in the Y-Room of HSU1 or falling through a floor hatch, as Mr. Lucas has alleged.  (SUF at ¶ 54.)

In addition, precautions had been taken with regard to the basement hatch.  It is undisputed that Mr. Hunter closed the door to the Y-Room while he was working in the basement (SUF, ¶32) and when he left the room with the hatch open, he verified that the room would be monitored by Officer Cunningham.  (SUF, ¶35.)  Mr. Hunter never saw Plaintiff enter the Y-Room. (SUF, ¶36.)  There is no evidence that Mr. Hunter was deliberately indifferent to Mr. Lucas's safety.

Officer Cunningham did allow Mr. Lucas into the Y-room but when he realized that Mr. Lucas did not appear to notice the open floor hatch, he warned him to watch out.  Officer Cunningham testified that Mr. Lucas was in the Y-room for less than a minute before he fell.  Mr. Lucas alleges he was in there for three to

four minutes before he fell.  (Lucas Depo. at 28, lines 2-4, Doc. 49-1 at 9.)  Yet, he

also admits that Officer Cunningham told him to watch out after he had been in the

room for about one minute.  (Deposition Correction Sheet, Doc. 49-2 correcting

Depo. page 25, line 16.)  The fact that Officer Cunningham warned Mr. Lucas of

danger demonstrates a lack of deliberate indifference.

Further, unlike the *Frost* and *Townsend* cases, there are no disputed facts

upon which a reasonable jury could find that the basement hatch presented such a

serious risk that Defendants should have known of the risk it posed to inmates.  It

is undisputed that there was a chain and warning sign that could have been used.

Although it was not used in this situation, Mr. Hunter left a guard to monitor the

situation.  Leaving the hatch open without the warning chain at most could only be

considered negligence.

Moreover, this is a situation where Mr. Lucas could have provided for his

own safety.  Mr. Lucas was made aware of the hatch by observing it when he was

in the Y-Room prior to May 13, 2015, and then asking questions.  (SUF at ¶ 27.)

He had seen the hatch open when he was a unit laundry worker, "maybe two or

three times. . . . and it's like that, it's just left opened.  But it's rare that it's actually

left opened and unsecured or anything like that."  (SUF at ¶ 28.)  Mr. Lucas had

"never seen" the warning sign in use when he was a laundry worker.  (SUF at ¶

13

29.)  Although Mr. Lucas alleges that there was inadequate lighting, he admits he was in the Y-room maneuvering boxes around so he could see their labels.  (Lucas Depo. p. 28, Lines 7-9, Doc. 49-1 at 9.)  If the lighting was sufficient to read the labels on boxes, it should have been sufficient to see the open hatch.  Moreover, Mr. Lucas has stated that his claimed inability to see the hatch on May 13, 2015, was caused, not by the alleged absence of a ceiling light, but  because when he "entered the room" he was "coming from a light sunny day and [his] eyes weren't fully adjusted."  (Grievance #6890, May 22, 2015, Doc. 54-6.)

Viewing the evidence in the light most favorable to Mr. Lucas, there are no facts upon which a reasonable jury could conclude Defendants knew or had reason to know the basement hatch posed a significant risk to inmate safety and that Defendants disregarded that risk.

Even if the Court were to assume that the open shaft presented an excessive risk to Mr. Lucas's health or safety, there is a lack of evidence to establish that each defendant was both aware of the risk and disregarded the risk.  There is no disputed issue of fact regarding whether the individuals on scene when Mr. Lucas was injured were deliberately indifferent to his safety.  Mr. Hunter left the hatch open but he verified that Officer Cunningham would monitor the room.  Mr. Lucas was only in the room for a short period of time (at most 3-4 minutes) before he fell

and he testified that Officer Cunningham told him to watch out after he had been in the room for about a minute.  (Lucas Depo correction sheet, Doc. 49-2 –warned "after I had been in the room for about 1 minute.")  Under these facts, there is no showing of deliberate indifference.

Inmate Ball testified by affidavit that he told Unit Manager Jovanovich, Officer Cunningham, Sgt. Wohlman, and Mr. Hunter about the open hatch and Lucas working unsupervised in the Y-room.  (Ball Declaration, Doc. 14-1.)  Yet, Mr. Lucas was not unsupervised, he was aware of the hatch, had seen it open in the past, and he was warned just prior to his fall.  There is no disputed issue of material fact regarding whether any of these Defendants were deliberately indifferent to Mr. Lucas's safety.

The only remaining Defendants are Mr. Arnold and Warden Kirkegard both of which are supervisory officials.  Ken Arnold has been the Maintenance Director at MSP for the past four and one half years but he was not at work on May 15, 2013.  (SUF at ¶ 5.)  Warden Leroy Kirkegard has been the Warden of MSP since November of 2011.  (SUF at ¶ 4.)  A supervisor may be individually liable under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."  *Starr v. Baca*, 652 F.3d 1202,

1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).

To be held liable, a supervisor need not be physically present when the alleged

constitutional injury occurs nor be "directly and personally involved in the same

way as are the individual officers who are on the scene inflicting constitutional

injury." *Starr*, 652 F.3d at 1205 (citation omitted).  Here, there is no evidence that

any individual officer caused a constitutional violation.  As such, Warden

Kirkegard and Mr. Arnold cannot be held liable under a theory of supervisory

liability.

Based upon the foregoing, the Court issues the following:

## RECOMMENDATIONS

1.  Defendants' Motion for Summary Judgment (Doc. 48) should be

GRANTED and this matter DISMISSED.  The Clerk of Court should be directed

to close the case and enter judgment in favor of Defendants pursuant to Rule 58 of

the Federal Rules of Civil Procedure.

2.  The Clerk of Court should be directed to have the docket reflect that the

Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate

Procedure that any appeal of this decision would not be taken in good faith.  No

reasonable person could suppose an appeal would have merit.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS &
## RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations within fourteen (14) days after service (mailing) hereof.[2]  28 U.S.C. § 636.  Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Fed.R.App.P. 4(a), should not be filed until entry of the District Court's final judgment.

DATED this 28th day of July 2017.


/s/ John Johnston
John Johnston
United States Magistrate

---

[2]As this deadline allows a party to act after the Findings and Recommendations is "served," it falls under Fed.R.Civ.P. 6(d).  Therefore, three (3) days are added after the period would otherwise expire.